IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

JERRY L. HAMMON,             )
                                     )
       **Plaintiff,**          )
                                     )
**vs.**                             )     **CIVIL ACTION NO. 12-00454-KD-C**
                                     )
**BOARD OF SCHOOL COMMISSIONERS** )
**OF MOBILE COUNTY, ALABAMA,**   )
                                     )
       **Defendant.[1]**     )

**ORDER**

This action is before the Court on the Motion for Summary Judgment (Doc. 23) and

supporting materials (Docs. 24-26) filed by the Defendant, the Board of School Commissioners

of Mobile County, Alabama (the Board), the Response in opposition and supporting materials

(Docs. 27-31) filed by Plaintiff Jerry L. Hammon (Hammon), and the Board's Reply (Doc. 32).

Upon consideration, and for the reasons stated herein, the Board's motion is **GRANTED**.

**I. Procedural History**

Hammon filed his charge with the Equal Employment Opportunity Commission in

October 2010 and timely filed this action after receiving his Notice of Rights letter from the

EEOC (Doc. 26-1, p. 16-17; Doc. 1 at ¶ 8; Doc. 1-1).  Hammon alleges that he was

discriminatorily denied a math teaching position by the Board on the basis of his race and sex in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), as

amended by the Civil Rights Act of 1991, on basis of race in violation of 42 U.S.C. § 1981, and

on the basis of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §

---

[1] Superintendent Martha Peek was dismissed from this action. (Doc. 10)

621 *et seq.* (ADEA).  The Board timely filed its answer denying liability on all counts. (Doc. 5)

**II. Findings of Fact**[2]

Hammon is a white male over the age of 40.  (Doc. 31-10, p. 2, Hammon Declaration)

He received his B.S. Degree in Adult Interdisciplinary Studies from the University of South

Alabama in 2001.  (Doc. 26-1, p. 5, Hammon Depo.; Doc. 26-1, p. 31. Ex. 1, Hammon Resume)

Hammon was first employed as a teacher with the Mobile County Public School System

(MCPSS) at the beginning of the 2001-2002 school year.  (Doc. 26-1, p. 6)  Prior to then,

between 1990 and 2001, Hammon taught at private schools.  (*Id.* p. 31)  The following is a

chronological listing of the schools at which Hammon has taught:

| SCHOOL | SCHOOL YEAR(S) |
|---|---|
| Evangel Christian School (Eight Mile, AL) | 1990-1991 |
| Northway Christian Academy (Eight Mile, AL) | 1991-1992 |
| First Independent Methodist School (Mobile, AL) | 1992-1993 |
| Mowa Choctaw Friends Academy (McIntosh, AL) | 1996-1998 |
| Oak Park Christian School (Mobile, AL) | 1998-2000 |
| St. Mary School (Mobile, AL) | 2000-2001 |
| Mary G. Montgomery High School (MCPSS) | 2001-2002 (fall semester only) |
| Shaw High School (MCPSS) | 2001-2002 (spring semester only) |
| Williamson High School (MCPSS) | 2002-2004 |
| Blount High School | 2004-2006 |

---

[2]The Court has made its determination of facts by "review[ing] the record, and all its inferences, in the light most favorable to [the Plaintiff,] the nonmoving party."  *Benson v. Tocco, Inc.,* 113 F.3d 1203, 1207 (11th Cir. 1997).

| (MCPSS) | |
|---|---|
| Daphne High School (Baldwin County School System) | 2006-2007 |
| B.C. Rain High School (MCPSS) | 2007-2010 |

(*Id.*, p. 6-9, 31)

Hammon states that he left Blount after two years because his family was contemplating moving to Baldwin County, that his position in Daphne was "non-renewed" because of budget cuts,[3] and that his position at Rain was also "non-renewed" because of budget cuts. (Doc. 31-10, p. 6).  Hammon states that with the exception of his decision to relocate to Baldwin County, his moves to different schools were the "result of routine non-renewals of probationary teachers." (Doc. 31-10, p. 7)   Since the end of the 2009-2010 school year, Hammon has continued working with the MCPSS as a substitute teacher.  (*Id.,* p. 4)

Hammon first interviewed with Vigor High School Principal Kenneth Edwards, a black male, for the math teacher vacancy at Vigor in the summer of 2009.  In his declaration, Hammon states as follows:

> During our interview Kenneth Edwards told me that the position shown as vacant . . . was currently held by a long term substitute who was doing a good job and who he would not replace.  He told me that "she is working on completing her certification".  The interview ended with no job offer but Edwards told me that if the long term substitute was not allowed to continue in the position, I would be considered.

(Doc. 31-10, p. 8).

---

[3]  Carol Palumbo, Assistant Principal at Daphne High School, wrote a letter of recommendation to Kim Staley, Principal at B.C. Rain High School, wherein she stated that Hammon was "an excellent teacher." (Doc. 31-10, p. 27) Palumbo also signed a "Confidential Reference Form" which indicated that Hammon's reason for leaving was "Reduction in force" and that he would be recommended should her school have a vacancy. (*Id.,* p. 28-29)

In July 2010, after receiving notice that his position at Rain would not be renewed and meeting with Bryan Hack, Executive Manager of Human Resources, Hammon again interviewed with Edwards regarding the math teacher vacancy at Vigor.  (Doc. 26-2, p. 4, 8, Edwards Depo.; Doc. 31-10, p. 2) At that time, Hammon was certified to teach high school math and was rated "highly qualified" under state and federal law.  (Doc. 31-10, p. 2; Doc. 31-1, p. 4, Hack Depo.) Hammon states that Edwards told him during this interview that "the position at Vigor was open, but he was trying to hold [the vacant teaching position] for the teacher who had filled the position during the 2009-10 school year . . . that she, the teacher, was working on completing her certification but he wasn't certain if she would have it or not . . . [and that] he was protecting the position for the uncertified teacher so she could qualify for the position."  (Doc. 31-10, p. 10)

 Later, in August 2010, Hammon met again with Hack about possible math positions in the MCPSS.  Hack did not mention the position at Vigor, so Hammon asked about that position. Hack told him that "state law allows for one exception and a School Board member has asked the Superintendent to protect that position for the non-certified teacher" and that "[w]e are not going to touch that one." (Doc. 31-10, p. 10)  A few days after this meeting, Hammon went to the Human Resources Department of the MCPSS to speak with John Powell (Powell), the Personnel Administrator for High Schools, about job vacancies in the school system. (*Id*., p. 11) During this meeting, Powell told Hammon that "the math position held for the non-certified teacher at Vigor was being vacated" and that Hammon should go to Vigor to interview. (*Id.*).

Hammon did so and met again with Edwards. (*Id*.)  Hammon told Edwards that Powell had told him that the position was being vacated and Hammon asked for the job. (*Id.,* p. 11-12) During their meeting, Edwards contacted the MCPSS office to verify the information.  He then told Hammon that the position would not be vacated, but that Hammon would be considered if

4

the position was vacated. (*Id.,* p. 12)

Hammon next contacted his employee organization representative Danny Goodwin who sent a complaint to Hack, the Superintendent, and the Board that a position was reserved for an uncertified teacher in preference to Hammon, a certified and highly qualified applicant (Doc. 31-10, p. 12; Doc. 31-11, p. 3, Goodwin Declaration; Doc. 31-10, p. 40, copy of letter). A few days later, Goodwin contacted Hammon to inform him that the Superintendent had removed the hold from the Vigor position and that Edwards would make the final decision. (Doc. 31-10, p. 13). Hammon then met with Edwards for a fourth interview. (*Id.*) However, Edwards indicated that the position would be "re-advertised." (*Id*)

After the interview, Edwards contacted the principals of two schools where Hammon had previously worked – Marlon Firle at B. C. Rain High School (2007 through 2010) and Ron Coleman at Blount High School (2004 through 2006). (Doc. 26-2, p. 11, 13) Edwards testified that Firle told him that while Hammon "knows his subject content, . . . he has a problem with his classroom management." (Doc. 26-2, p. 11) Edwards admits that he "didn't go into any of the detail" as to this criticism and that he "take[s] the value of what [a] principal is saying" and "d[oes]n't go into the valuation of it." (*Id.*). At his deposition, Firle could not give the specifics of any verbal admonitions regarding Hammon's classroom management. (Doc. 31-9, p. 3, 4, Firle Depo.) He confirmed that he told Edwards "there were some classroom management issues with Mr. Hammon" but did not "recall going into any detail." (Doc. 31-9, p. 7, Firle Depo.). Firle also recalled giving Hammon "some verbal feedback as to classroom management." (*Id.*) Hammon states that Firle never provided him with any written or verbal feedback and to the contrary, Firle's written evaluations indicated that classroom management was an area of

strength. (Doc. 31-10, p. 3)[4]

Edwards testified that Coleman said that Hammon "had problems in classroom management[,]" although Edwards again did not inquire further and admits that their conversation lasted only a minute or two, "if that long." (*Id.,* p. 13-14). Coleman testified that he did not "recall" any communications with Edwards about Hammon. (Doc. 31-5, p. 3, Coleman Depo.) Hammon states that Coleman was the principal at Blount in 2004-2005. He disputes Coleman's comments as testified by Edwards. (*Id.* p. 5) Hammon also points out that any deficiencies Coleman may have observed in 2004 did not prevent his employment at Blount the next year and at Rain from 2007 until 2010. (*Id.*)[5]

Hammond states that during the 2005 - 2006 term, his principal at Blount was Don Mitchell. Hammon states that Mitchell never gave him any written or verbal admonition as to classroom management, that his end-of-year rating for classroom management was an area of strength,[6] and that Mitchell appointed Hammon to his leadership team. (Doc. 31-10, p. 4-5)

Edwards testified that Hammon mentioned needing only one or two more years to become vested with the MCPSS. (Doc. 26-2, p. 15) Based on "how" and "when" the statement

---

[4] On August 16, 2007, Firle stated in an "Instructional Observational Snapshot" that "[i]t is evident that classroom management is in order." (Doc. 31-13, p. 38) On May 19, 2009, Firle reported that "Mr. Hammon presents instruction in an organized manner", "Mr. Hammon manages class time and student behavior", and "Mr. Hammon promotes a positive learning climate." (Doc. 31-13, p. 3-4, Alabama Professional Education Personnel Evaluation Program Evaluation Summary Report (PEPE)).

[5] In November 2004, during Hammon's first semester at Blount, Coleman had written a memorandum which was placed in Hammon's file. (Doc. 26-1, p. 35) He documented an informal classroom observation finding that Hammon did not have his classroom under control.

[6] Hammon provides a copy of his PEPE showing that it was completed by Mitchell (Doc. 31-10, p. 30-33) Under "Classroom Management", Hammon's competency score was 3 "Area of Strength" with the highest score possible of 4 "Demonstrates Excellence" (*Id.*, p. 31) The document is either un-signed or the signatures did not survive the conversion to PDF format.

was made, Edwards "looked at that to be someone saying that they were willing to work two years and not longer" and that he was "looking for someone to make a long-term endowment on [his] kids, not a short term." (*Id.*)  Hammon states that he told Edwards that he had one more year to vest in the retirement system but that he intended to continue working as long as possible and had no plans to retire. (Doc. 31-10, p. 7)

The position Hammon sought remained vacant until January 2011, when it was filled by Kimebric Windham (Windham), an African-American female below the age of 40. Windham is the "long term substitute" who was allowed to continue in the position.  She had worked continuously at Vigor since the beginning of the 2005-2006 school year, either as an unpaid intern, a substitute, or a teacher. (Doc. 25-6, p. 4-6)  She had been actively involved at Vigor by sponsoring the cheerleading squad and volunteering with other athletic teams even during time periods when she was not employed as a substitute teacher or teacher. (Doc. 25-6, p. 4-6)

In May 2010, at the request of Edwards, Windham had written Powell to request that she be allowed to substitute teach math at Vigor during the fall of 2010 as fulfillment of her internship requirement with Alabama State University where she was pursuing her Master of Education with a major in math education. (Doc. 31-2, p. 3-4, Powell Depo.; Doc. 31-6, p. 9-10, Windham Depo.) Powell does not recall taking any action on the letter but recalls that Edwards requested Windham and that the decision whether to allow Windham to substitute "would have been left up to the principal." (Doc. 31-2, p. 21 (Powell Depo.)

Ultimately, Windham began teaching at Vigor during the fall of 2010 and obtained her master's degree in December 2010. (Doc. 25-6, p. 7; Doc. 31-13, p. 10, Statement of Degree Completion from the Registrar at Alabama State University) A "Professional Educator Certificate" was issued to Windham in May 2011. (Doc.  31-13, p. 9)  Effective January 13,

7

2011, she was hired as the secondary math teacher in the position Hammon sought.  (Doc. 31-13, p. 8, "Employee Action Form")[7]

Windham is a long-time family friend of Board Member Reginald Crenshaw.  Crenshaw is a black male.  Vigor is in his district. (Doc. 31-8, p. 8-10, Crenshaw Depo.) Crenshaw has known Windham for more than thirty years and knew her father, mother and taught her brother. (Doc. 31-8, p. 11-12, Crenshaw Depo.)  In its reply, the Board states that "the Board and Dr. Crenshaw vehemently denies he did anything to influence Mr. Edwards's decision." (Doc. 32-5) Executive Director of Human Resources, Pauline Scarbrough testified that she believed she "had heard someone mention his name" in connection with the math position at Vigor but she had no "direct knowledge" of Crenshaw exerting pressure regarding the position. (Doc. 31-3, p. 18, Scarbrough Depo.)

During the relevant time period, Dr. Roy Nichols was the Superintendent.  During his term, the Board adopted a policy whereby their authority was limited to actions taken as a board and for board members to give directions to school system employees, including principals, would not be a "proper role". (Doc. 31-7, p. 9-13, 13)  Nichols reviewed several items of intra-office communications regarding the math teacher position at Vigor but could not specifically recall whether Crenshaw had pressured him to allow an uncertified teacher to be hired for the position. (Doc. 31-7, p. 10)  Nichols testified "Dr. Crenshaw was one of those [board members] who tended to get more involved than he needed to." (Doc. 31-7, p. 10)

---

[7]  Hammon asserts that Windham "repeatedly received special dispensations" from the MCPSS in violation of Board policy and Alabama law including allowing her to substitute teach or teach when she did not have the requisite teaching certificate or an application for an alternative certificate or a "highly qualified" status and allowing her to student teach and receive pay as a substitute in violation of Board policy. (Doc. 29, p. 15-16, Hammon's Statement of Contested Facts)  However, there is no dispute of fact that in the summer of 2010, when Hammon sought the math teacher position, he was properly certified and Windham was not.

### III. Conclusions of Law

### A. Summary judgment standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  If a party asserts "that a fact cannot be or is genuinely disputed", the party must

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)(B).

The Board, as the party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Clark,* 929 F.2d at 608 quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986).

Once the Board has satisfied its responsibility, the burden shifts to Hammon, as the non-movant, to show the existence of a genuine issue of material fact. *Id*. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v.*

*Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-159, 90 S. Ct. 1598, 1608-1609 (1970). However, "[a] moving party is entitled to summary judgment if the nonmoving party has 'failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.'" *In re Walker*, 48 F. 3d 1161, 1163 (11th Cir. 1995) quoting *Celotex Corp.*, 477 U.S. at 323, 106 S. Ct. at 2552.

Overall, the court must "resolve all issues of material fact in favor of the [non-movant], and then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts." *McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (citing *Durruthy v. Pastor*, 351 F.3d 1080, 1084 (11th Cir. 2003)).

However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment. *Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004).  "An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. It is genuine if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (citation omitted).

**B. Title VII Race and Sex Discrimination claim**

Title VII makes it "an unlawful practice for an employer to [ ] fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's" race or sex. 42 U.S.C. § 2000e–2(a)(1).  Hammon, as the plaintiff bears the burden of proving that he has been discriminated against on basis of race and sex and he may establish his claims

through either direct or circumstantial evidence of discrimination. *Dixon v. The Hallmark Companies, Inc*., 627 F.3d 849, 854 (11th Cir. 2010). Hammon relies upon circumstantial evidence, and therefore, the court applies the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1272 (11th Cir. 2002). Under this framework, Hammon must initially establish a *prima facie* case of discrimination and thus create a rebuttable presumption that the Board has discriminated against him. *Lane v. Broward County, Florida*, 411 Fed.Appx. 272, 273 (11th Cir. 2011) (quoting *Joe's Stone Crab*, 296 F. 3d at 1272-1273). The "burden then shifts" to the Board to rebut the presumption by producing evidence that it did not hire Hammon for "some legitimate, non discriminatory reason." *Id*. If the Board meets this burden of production, then the "presumption of discrimination is rebutted" and Hammon "must show that the "proffered reason really is a pretext for unlawful discrimination." *Id*. Although the burdens shift, "the ultimate burden of persuading the trier of fact" that the Board has intentionally discriminated against Hammon remains "at all times" with Hammon. *Id*.

There is no dispute of fact that Hammon has met the initial burden of establishing a *prima facie* case of discrimination on the basis of race and sex. (Doc. 24, p. 4-5). Hammon is a member of a protected class, he applied for the math teacher position and was qualified for the position, he was not hired despite his qualification, and the position was filed by Kimebric Windham, a person outside his protected class. *Lane*, 411 Fed. Appx at 273.

The burden then shifts to the Board to produce, *i.e*., articulate a legitimate, non-discriminatory reason for its decision. *Id*. at 273. The burden is "exceedingly light" since the Court makes no credibility determinations and "need not be persuaded that the [Board] was actually motivated by the proffered reason." *Id*. at 273-274. The Board has met its burden of

11

production in that it has articulated "clear and reasonably specific non-discriminatory basis for its action." *Id.* at 274.   The Board proffered that Hammon was not hired because he had a record of poor classroom management, a history of job-hopping, and because Edwards was looking for a teacher who would make a long term commitment to Vigor (Doc. 24, p. 8-10).

The issue now is whether Hammon can "come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the [Board] were not its true reasons, but were a pretext for discrimination." *Id.* at 274 (citation omitted)  Hammon argues that the evidence from which a jury could find that the proffered reasons are false is that an "African-American Board member had intervened to place a 'hold' on filling the position at Vigor so that a younger, unqualified, African-American female could continue to seek to qualify for the position." (Doc. 30, p. 15)  Hammon argues that "it was unfair to deny the position to [him] and that a properly certified person should be placed in the position." (*Id.*)  Hammon argues that each of the Board's proffered reasons are "fraught with weakness, implausibility or outright" false and that his evidence casts sufficient doubt on the proffered reasons to allow a reasonable fact-finder to decide that the reasons were a pretext for discrimination. (*Id.*)[8]

---

[8]  Hammon has come forward with some evidence to rebut the proffered reasons given by the Board.  First, he presented evidence that any alleged deficiency in classroom management had been in his distant teaching history, that in his more recent evaluations "classroom management" had been an "area of strength" by the Principal at Rain, and that he had been recommended as an "excellent teacher" by the Assistant Principal at Daphne.  Second, as to the proffered reason of "job-hopping", Hammon presented evidence that during the past five years, the changes in teaching positions were the result of budget cuts or routine transfers of probationary new teachers with only one instance of a voluntary decision to change schools.  He also presented evidence that during the past five years, he taught at Blount for two consecutive years and most recently, taught at Rain for three consecutive years. Third, Hammon testified that while he needed one more year to vest in the MCPSS pension, he told Edwards that he intended to "keep working as long as [he] possibly could, had no plans to retire and wanted to work for the long haul." (Doc. 31-10, p. 7)  However, much of this is "quarreling with the wisdom" of the reasons which is not subject to second-guessing by this Court. *Chapman v. AI Transport*, 229 (Continued)

Hammon's argument is based on the fact that Crenshaw and Windham are black and Windham is female.  However, the Court finds that Hammon has not met his burden to come forward with sufficient evidence from which a fact-finder could reasonably infer that Edwards and hence, the Board, did not hire Hammon because of his race and sex.  Instead, the evidence would support a finding that Crenshaw involved himself in the process, not because Hammon was a white male, but because Crenshaw wanted the job for a close family friend, Windham.  Under this scenario, Edwards, under pressure from Crenshaw, would not have hired any other applicant regardless of their race or sex.  In other words, fair or unfair, the job was going to be Windham's.  There simply is no evidence to support that Hammon was rejected because he was male or because he was white.  He was rejected because he wasn't Windham.

Additionally, the *McDonnell-Douglas* "framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir. 2011).  Hammon's discrimination claims may proceed to trial "if the record, viewed in a light most favorable to [him], presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Id.* (internal citations and footnote omitted); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1255-56 (11th Cir. 2012) (applying *Smith* in holding that an employee "d[id] not have to use the *McDonnell-Douglas* framework to survive summary judgment because the record contain[ed] enough non-comparator evidence for a jury to reasonably infer that [her supervisor]

_____

F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

discriminated against [her] because she was pregnant). The "convincing mosaic" Hammon has presented is that favoritism but not racism or sexism controlled this hiring decision. There simply is no circumstantial evidence that would allow a jury to infer intentional race or sex discrimination against Hammon by the Board.

**C. Title 42 U.S.C. § 1981 claim of race discrimination and Title 42 U.S.C. § 1985(3) claim of conspiracy.**

In Count II of the complaint, Hammon alleged that he had been discriminated against on basis of race in violation of 42 U.S.C. § 1981 because the Board had given the teaching position to "an unqualified African-American in a manner substantially motivated by the factor of race". (Doc. 1, p. 10-11). The Board moved for summary judgment as to this count (doc. 24, p. 10-11).

In the opening paragraph, Hammon alleged that this action was also brought pursuant to 42 U.S.C. § 1985(3). (Doc. 1, p. 1) However, 42 U.S.C. § 1983 was not invoked and Hammon did not plead a separate count for conspiracy to interfere with his civil rights under § 1985(3). The Board moved for summary judgment as to any claim alleging a conspiracy on basis of the intra-corporate conspiracy exception. [9]

Hammon did not respond in opposition to the Board's argument. (Doc. 30, p. 14-15) Therefore, Hammon is deemed to have abandoned his claim of race discrimination under § 1981 and any claim asserted under 42 U.S.C. § 1985(3). Accordingly, summary judgment is granted in favor of the Board as to Count II and any claim asserted for conspiracy to violate civil rights. *See Ekokotu v. Federal Express Corp.,* - - - Fed. Appx. - - -,  2013 WL 3491397, *2 (11th Cir.

---

[9]  Pursuant to the intracorporate conspiracy doctrine, corporate employees cannot conspire among themselves where they are acting within the scope of their employment, *i.e.*, as agents of the corporation. Their conduct is attributable to the corporation and that negates "the multiplicity of actors necessary for the formation of a conspiracy." *Grider v. City of Auburn*, 618 F .3d 1240, 1261 (11th Cir. 2010) (quotations omitted).

14

2013) ("Here, the district court did not err with respect to Ekokotu's national origin discrimination claims. First, the court correctly held that Ekokotu abandoned the claims because he not only failed to argue them in response to FedEx's motion for summary judgment, but he explicitly and unequivocally disavowed them in response to FedEx's motion for summary judgment.") (citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995)); *Foy v. Pat Donalson Agency*, - - - F. Supp. 2d - - -, 2013 2248157, *20 (N.D. Ala. May 22, 2013) (finding that Foy abandoned the FLSA cause of action "when she failed to address in her response the argument on that claim set out in defendants' initial [summary judgment] brief") (citing *Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F. 3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned")).

### D.  ADEA claim

The Board argues that because the ADEA "requires that age be the reason that the employer decided to act, an ADEA plaintiff must establish 'but for' causality, no 'same decision' affirmative defense can exist: employer either acted because of plaintiff's age or it did not." (Doc. 24, p. 12).   The Board argues that Hammon cannot pursue both race and gender discrimination and age discrimination because "by it very nature he cannot prevail on an age claim since age would not be the 'but for' cause of his not receiving the position." (*Id.*).

Hammon does not address the Board's position that he must now decide between his ADEA claim and his Title VII claims.  Instead, Hammon makes the identical argument in response to both – that he has made his prima facie case and that the Board's proffered reasons are a pretext for discrimination.

The ADEA prohibits employers such as the Board from refusing to hire an employee who

is at least 40 years of age because of that employee's age. The statute provides, in relevant part,

that "[i]t shall be unlawful for an employer ... to fail or refuse to hire or to discharge any

individual or otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §

623(a)(1).

 The issue of whether the plaintiff could bring both an ADEA claim and a race claim

under Title VII in the same action without resulting in the dismissal of the ADEA claim was

recently addressed in *McQueen v. Wells Fargo Home Mortgage*, 2013 WL 3357000 (N.D. Ala.

June 28, 2013).  In *McQueen*, the district court discussed the decisions in *Gross v. FBL Financial

Services, Inc*., 557 U.S. 167, 176, 129 S.Ct. 2343, 2350 (2009), *Mora v. Jackson Memorial

Foundation, Inc*., 597 F.3d 1201, 1204 (11th Cir. 2010), and *Archie v. Home-Town Suites, LLC*,

749 F. Supp. 2d 1308 (M.D. Ala. 2010) and held that "under the ADEA, the plaintiff can allege

that the alleged discriminatory acts were committed *both* because of her age and race".

*McQueen*, at *22 (italics in original).   In *Archie*, the district court addressed whether a plaintiff

could pursue both a gender and an age claim arising from the same adverse employment action.

The district court explained that

> [G]ross requires "but for" causation. It has long been the law that there is a
> difference between "but for" causation and "sole" causation. *See McDonald v.
> Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 49 L.Ed.2d
> 493 (1976) (distinguishing sole causation from but for causation); *see also
> McNely v. Ocala Star–Banner Corp.*, 99 F.3d 1068, 1076 (11th Cir.1996)(same).
> *Gross* refers only to "but for" causation. *Gross*, 129 S.Ct. at 2350.

> It appears to the court, therefore, that even after *Gross*, a plaintiff might prove
> that gender discrimination was a substantial or motivating factor in an adverse
> employment action, satisfying the standard for the Title VII claim, but also show
> that if it had not been for her age, she would not have been terminated, satisfying
> the ADEA standard.

*Archie*, 749 F. Supp. 2d at 1315 n. 4; *McQueen*, at *22.

Despite the Board's argument, it appears that Hammon may bring both a Title VII claim

and an ADEA claim and need not elect between the two.  In that regard, as with Title VII,

> A plaintiff can establish age discrimination through either direct or
> circumstantial evidence. *Mora v. Jackson Mem'l Found., Inc*., 597 F.3d 1201,
> 1204 (11th Cir.2010). Prior to *Gross*, we consistently evaluated ADEA claims
> based on circumstantial evidence of discrimination under the burden-shifting
> framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,
> 36 L.Ed.2d 668 (1973). *See, e.g., Chapman v. AI Transp*., 229 F.3d 1012, 1024
> (11th Cir.2000) (*en banc*). Under this framework, a plaintiff must first establish a
> prima facie case of discrimination. *Id*. at 1024. Next, the defendant must
> articulate a legitimate, non-discriminatory reason for the challenged employment
> action. *Id*. If the defendant articulates one or more such reasons, the plaintiff is
> afforded an opportunity to show that the employer's stated reason is a pretext for
> discrimination. *See Kragor v. Takeda Pharm. Am., Inc*., 702 F.3d 1304, 1307,
> No. 11–16052, 2012 WL 6618360, at *2 (11th Cir. Dec. 20, 2012) (citing *Reeves
> v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143, 120 S.Ct. 2097, 2106,
> 147 L.Ed.2d 105 (2000); *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825).
> The burden of persuasion always remains on the plaintiff in an ADEA case to
> proffer evidence sufficient to permit a reasonable fact finder to conclude that the
> discriminatory animus was the "but-for" cause of the adverse employment
> action. *See Gross*, 557 U.S. at 176, 129 S.Ct. at 2350.
>
> Following *Gross,* we have continued to evaluate ADEA claims based on
> circumstantial evidence under the *McDonnell Douglas* framework. *See Kragor,*
> 702 F.3d at 1308, 2012 WL 6618360, at *2. This is not only consistent with our
> pre- *Gross* case law, but also it is entirely consistent with *Gross,* which expressly
> left open the question of whether this application is appropriate. *Gross*, 557 U.S.
> at 175 n. 2, 129 S.Ct. at 2349 n. 2 ("[T]he Court has not definitively decided
> whether the evidentiary framework of [ *McDonnell Douglas*] utilized in Title VII
> cases is appropriate in the ADEA context."). *Gross* held that it is improper to
> shift the burden of persuasion to the defendant in an age-discrimination case. Id.
> at 173, 129 S.Ct. at 2348 ("[W]e must first determine whether the burden of
> persuasion ever shifts to the party defending an alleged mixed-motives
> discrimination claim brought under the ADEA. We hold that it does not."
> (footnote omitted)). But the *McDonnell Douglas* framework does not shift the
> burden of persuasion to the defendant; instead, once the employee establishes a
> prima facie case of discrimination, the burden of production is shifted to the
> employer to articulate a legitimate, non-discriminatory reason for the adverse
> employment action. *See Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248,
> 254–55, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). If the employer offers
> a legitimate, non-discriminatory reason, the employee is afforded an opportunity
> to show that the employer's stated reason is a pretext for discrimination. *See id*. at
> 256, 101 S.Ct. at 1095; *see also Kragor*, 702 F.3d at 1308, 2012 WL 6618360, at
> *2. Importantly, throughout this entire process, the ultimate burden of persuasion

remains on the employee. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506–07, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) ("It is important to note, however, that although the *McDonnell Douglas* presumption shifts the burden of production to the defendant, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against remains at all times with the plaintiff.' ") (citation omitted); *see also Willis v. Conopco, Inc.,* 108 F.3d 282, 286 (11th Cir.1997).

Our continued application of the *McDonnell Douglas* framework in ADEA cases is also consistent with all of our sister circuits that have addressed the issue. . . .

Although our *Kragor* decision and our holding today reaffirm the use of the *McDonnell Douglas* framework in ADEA cases, this framework is not the *sine qua non* for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed Martin Corp*., 644 F.3d 1321, 1328 (11th Cir.2011). Instead, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.* A triable issue of fact exists "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (footnote omitted) (internal quotation marks omitted).

*Sims v. MVM, Inc.*, 704 F.3d 1327, 1332-1333 (11th Cir. 2013) (some internal citations omitted).

Hammon does not argue that he has direct evidence of age discrimination. Instead, he argues that he has presented sufficient evidence to rebut the Board's proffered explanation why he was not hired as a pretext for discrimination and produced evidence that the real reason was to hold the position for a younger, unqualified person.

The Board does not dispute that Hammon has made a prima facie case of age discrimination. He has shown that he is a member of a protected group of persons over age forty, that he was not hired for the teaching position, that a person outside his protected group was hired, and that he was qualified for the job at issue. *McQueen*, at *22. The burden of production then shifted to the Board to proffer legitimate non-discriminatory reasons for not hiring Hammon. Again, the Board proffers that Hammon was not hired because he had a record of poor classroom management, a history of job-hopping, and because Edwards was looking for

a teacher who would make a long term commitment to Vigor. (Doc. 24, p. 8-10)  The latter is based upon Edwards' impression that Hammon planned to work one or two more years, vest in the retirement system, and then retire from teaching.

The issue now is whether Hammon has "come forward with evidence sufficient to permit a reasonable fact finder to conclude that the legitimate reasons given by the [Board] were not its true reasons, but were a pretext for discrimination." *Lane*, 411 Fed. Appx  at 274 (citation omitted)  Hammon argues that the evidence from which a jury could find that the proffered reasons are false is that an "African-American Board member had intervened to place a 'hold' on filling the position at Vigor so that a younger, unqualified, African-American female could continue to seek to qualify for the position." (Doc. 30, p. 15)  Hammon argues that each of the Board's proffered reasons are "fraught with weakness, implausibility or outright" false and that his evidence casts sufficient doubt on the proffered reasons to allow a reasonable fact-finder to decide that the reasons were a pretext for age discrimination. (*Id.*)

However, the Court finds that Hammon has not met his burden to come forward with sufficient evidence from which a fact-finder could reasonably infer that Edwards and hence, the Board, did not hire Hammon because of his age.  Instead, as previously indicated, the evidence indicates only that Hammon was rejected because he was not Windham, not because of his age.

### IV.  Conclusion

As explained by the Court of Appeals for the Eleventh Circuit, the district courts

. . . do not sit as a "super-personnel department," and it is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive. *Chapman*, 229 F.3d at 1030. That is true "[n]o matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers." Id. (quotation marks and citations omitted); *see also Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir.1984) ("[An] employer may fire an employee for a good reason, a bad

reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."); *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d 1394, 1399 (7th Cir. 1997) (listing, among "embarrassing" but non-actionable reasons under Title VII, "nepotism, personal friendship, the plaintiff's being a perceived threat to his superior, a mistaken evaluation, the plaintiff's being a whistleblower, the employer's antipathy to irrelevant but not statutorily protected personal characteristics, a superior officer's desire to shift blame to a hapless subordinate ... or even an invidious factor but not one outlawed by the statute under which the plaintiff is suing; ... or there might be no reason").

*Alvarez v. Royal Atlantic Developers, Inc*., 610 F.3d 1253, 1266 -1267 (11th Cir. 2010).

Upon consideration of the evidence and for the reasons set forth herein, the Court finds that the Board is entitled to judgment as a matter of law.  *See McDowell v. Brown*, 392 F.3d 1283, 1288 (11th Cir. 2004) (having resolved all issues of material fact in favor of the non-movant, the court must "then determine the legal question of whether the [movant] is entitled to judgment as a matter of law under that version of the facts.") (citation omitted).  Accordingly, the Board's motion for summary judgment is GRANTED.

Judgment shall be entered by separate document as provided in Rule 58 of the Federal Rules of Civil Procedure.

DONE and ORDERED this the 22nd day of July 2013.


  s/  Kristi K. DuBose
KRISTI K. DuBOSE
UNITED STATES DISTRICT JUDGE